UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NOVARTIS ANIMAL HEALTH US, :
INC.,
 :
    Plaintiff,                       CIVIL ACTION
 :
v.                                    1:03-CV-272-MHS
 :
EARLE PALMER BROWN, LLC,
et al.,                      :

    Defendants.            :

### ORDER

This action is before the Court on defendant UPS Capital Corporation's motion for summary judgment. For the following reasons, the Court grants the motion.[1]

### Background

This action arises out of the alleged misappropriation of funds provided by plaintiff Novartis Animal Health US, Inc. (Novartis), to defendant Earle

---

[1] The Court denies defendant's request for oral argument, denies plaintiff's motion to strike, grants plaintiff's alternative motion to file a surreply, and grants defendant's request to file a response to the surreply.

Palmer Brown, LLC (EPB), to pay for a television advertising campaign. Unless otherwise noted, the following facts are not in dispute.

In 1997, Novartis, a provider of pharmaceutical products and services to the animal health industry, and EPB, an advertising agency, entered into an Advertising Agreement for the provision of general advertising services. Pursuant to the Advertising Agreement, in December 2001, Novartis and EPB agreed to a television advertising plan for 2002 (the "2002 Advertising Campaign"). A total of $9.4 million was budgeted to pay various media outlets throughout the country to air the planned advertisements (the "Media Placement Money").[2]

Novartis and EPB agreed to an advance billing schedule under which Novartis would provide EPB the Media Placement Money before the advertisements were aired. Pursuant to this agreed-upon schedule, EPB issued three invoices to Novartis totaling $9.4 million (the "Media Placement

---

[2] There is a dispute as to whether the $9.4 million included a 5% commission to be paid to EPB.

Invoices"). From late January through March 2002, Novartis issued several checks in payment of the Media Placement Invoices.

Meanwhile, on August 9, 2001, EPB's parent, defendant Panoramic Communications, LLC (Panoramic), had entered into a Factoring Agreement with defendant UPS Capital Corporation (UPSC), under which Panoramic assigned all of its accounts receivable to UPSC. Pursuant to the Factoring Agreement, Panoramic assigned the Media Placement Invoices to UPSC. In return, UPSC advanced a percentage of the invoice amounts (65%-85%) to Panoramic. When Novartis paid the invoices, the payments went to UPSC. Upon receipt of the payments, UPSC paid the balance of the invoice amounts to Panoramic, less its factoring fee and interest on the advances.[3]

In accordance with the 2002 Advertising Plan, EPB, through its affiliate, RJ Palmer, LLC, placed the Novartis advertisements with various media outlets, and all the advertisements were aired as scheduled. However, due to Panoramic's deteriorating financial condition, when the bills from the

---

[3] UPSC charged Panoramic a factoring fee of 45 basis points (.45%) on each factored account, so its fee on the $9.4 million at issue in this case was $42,300.

various media providers came due, they were not paid. Panoramic ultimately made partial payments to media providers accounting for approximately $3 million owed for the 2002 Advertising Campaign. Both Panoramic and EPB subsequently ceased doing business and made general assignments for the benefit of creditors.

Some media companies sued EPB and Novartis for failure to pay for the Novartis advertisements those companies ran during the 2002 Advertising Campaign. Among the suits filed against EPB and Novartis was the instant action, originally filed by Georgia Television Company d/b/a WSB-TV (WSB) seeking to recover $62,968, plus interest and attorney's fees, for advertisements aired on WSB's local television station. Novartis filed a cross-claim against EPB and a third-party complaint against Panoramic and UPSC in which it sought to recover all of its loss arising from the alleged misappropriation of the Media Placement Money. The Court later granted WSB's request to be dropped from the suit and realigned Novartis as the plaintiff and EPB, Panoramic, and UPSC as the defendants. Following completion of discovery, UPSC moved for summary judgment.

Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Supreme Court held that this burden could be met if the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case." Id. at 325. At that point, the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. Id. at 324.

In reviewing a motion for summary judgment, the Court must construe the evidence and all inferences drawn from the evidence in the light most favorable to the non-moving party. WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988). Nevertheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original).

Discussion

Novartis claims that Panoramic and UPSC conspired with EPB to misappropriate the Media Placement Money. (Second Am. Third-Party Compl. ¶ 38.) Novartis asserts claims against UPSC for fraud, violation of both state and federal Racketeer Influenced and Corrupt Organizations (RICO) Acts, conversion, tortious interference with contractual relations, unjust enrichment, breach of contract, breach of implied contractual duty of good faith and fair dealing, breach of fiduciary duty, and negligence. (Id. ¶¶ 39-141.) Novartis seeks an accounting and recovery of the $9.4 million in Media Placement Money, less amounts actually paid to the media providers, plus punitive damages, interest, and attorneys' fees. (Id. ¶¶ 142-150 & Prayer for Relief.)

UPSC contends that the provisions of Article 9 of the Uniform Commercial Code (UCC) governing factoring preclude Novartis's claims and entitle it to summary judgment. Specifically, UPSC argues that under current UCC § 9-404, which took effect July 1, 2001, as well as former UCC § 9-318, account debtors such as Novartis cannot recover payments made to contract assignees such as UPSC. UPSC relies on <u>Michelin Tires (Canada)</u>

6

<u>Ltd. v. First National Bank of Boston</u>, 666 F.2d 673, 677-79 (1st Cir. 1981), and later cases, which construed former UCC § 9-318 as providing account debtors a right to assert contractual defenses and claims against contract assignees as a set-off but not an affirmative right of recovery. UPSC also points to the explicit language of current UCC § 9-404, which states that "the claim of an account debtor against an assignor may be asserted against an assignee . . . <u>only to reduce the amount the account debtor owes</u>." O.C.G.A. § 11-9-404(b)(emphasis supplied).

In response, Novartis contends that UPSC's argument is irrelevant because Novartis has not asserted any claims against UPSC under the UCC. In addition, Novartis argues that <u>Michelin</u> and its progeny apply only to innocent assignees who take assignments in good faith. According to Novartis, the evidence in this case shows that UPSC knew the Media Placement Money did not belong to EPB; consequently, UPSC took the assignment of the Media Placement Invoices in bad faith. Because UPSC is not an innocent assignee, Novartis argues, Novartis's claims for an affirmative recovery against UPSC are not dependent on any rights or causes

7

of action provided under the UCC but are based instead on UPSC's knowing and unlawful participation in EPB's fiduciary fraud.

For the following reasons, the Court concludes that (1) Article 9 of the UCC applies to the factoring of the Media Placement Invoices; (2) Article 9 does not permit an account debtor like Novartis to make an affirmative recovery from an assignee like UPSC; and (3) the evidence does not support Novartis's claim that UPSC acted in bad faith. Accordingly, the Court concludes that UPSC is entitled to summary judgment.[4]

It is clear that the transactions at issue–Panoramic's assignment of the Media Placement Invoices to UPSC–are governed by Article 9 of the UCC. Subject to certain exceptions not applicable here, the UCC expressly provides that Article 9 "applies to . . . [a] sale of accounts . . . ." O.C.G.A. § 11-9-109(a)(3). An "account" is defined in pertinent part as "a right to payment of a monetary obligation, whether or not earned by performance, . . . for services rendered or to be rendered . . . [or] for a secondary obligation incurred or to

---

[4] In light of the following discussion, the Court finds it unnecessary to address the parties' arguments regarding the merits of each of Novartis's individual claims.

8

be incurred . . . ." O.C.G.A. § 11-9-102(a)(2). In this case, there is no dispute that the Media Placement Invoices represented Novartis's obligation to pay EPB, in accordance with an agreed-upon schedule, for placement of its advertisements with media vendors. Therefore, the Media Placement Invoices were "accounts," the assignment of which to UPSC is governed by Article 9.

Article 9 of the UCC provides that the rights of an assignee such as UPSC are subject only to an account debtor's claims "in recoupment." O.C.G.A. § 11-9-404(a)(1). Thus, under the UCC, an account debtor such as Novartis may assert a claim against an assignee such as UPSC "only to reduce the amount the account debtor owes." O.C.G.A. § 11-9-404(b). In Michelin and later cases, both state and federal courts have uniformly construed this provision and its predecessor, UCC § 9-318, not to create an affirmative right of action by an account debtor against an assignee. See Michelin, 666 F.2d at 677-80; see also Phil Greer & Assocs. v. Continental Bank, 614 F. Supp. 423, 427 (E.D. Pa. 1985); Gold Circle Stores v. Riviera Finance-East Bay, Inc., 540 F. Supp. 15, 21 (N.D. Cal. 1982); Ford Motor

9

Credit Co. v. Morgan, 536 N.E.2d 587, 590-91 (Mass. 1989); Lydig Constr., Inc. v. Rainier Nat'l Bank, 697 P.2d 1019, 1021-22 (Wash. App. 1985).

The evidence does not support Novartis's claim that UPSC acted in bad faith when it accepted the assignment of the Media Placement Invoices. Novartis's bad faith argument relies on the contention that it was improper for UPSC to factor the Media Placement Invoices because the funds were intended to be used to pay the various media providers in the 2002 Advertising Campaign. Neither the facts nor the law supports this contention.

First, the evidence does not support Novartis's contention that payment of the Media Placement Invoices was made "in trust" and "earmarked" for payment to media vendors, thereby rendering them ineligible for factoring. Nothing in the Advertising Agreement specified that a trust relationship was created or even contemplated, and it is undisputed that the payments did not indicate that they were made "in trust" or "earmarked." Instead, the evidence shows that Novartis paid EPB in the ordinary course of business, and that

10

Panoramic placed the payments in its general operating account to pay its operating expenses and payables.

Thus, this case is distinguishable from Air Traffic Conference v. Downtown Travel Center, Inc., 383 N.Y.S.2d 805 (S. Ct. N.Y. 1976), on which Novartis relies. Unlike the Advertising Agreement between Novartis and EPB, the contract in that case expressly provided for a formal trust arrangement and escrow account. Id. at 806. In this case, on the other hand, the mere fact that Novartis may have trusted EPB to perform its contractual obligations and pay the media vendors did not create a formal trust relationship. See, e.g., Aon Risk Services, Inc. v. Commercial & Military Systems Co., 270 Ga. App. 510, 513 (2004).

Second, the evidence does not support Novartis's contention that the Media Placement Invoices could not be factored because they were advance billings for media placements that had not yet occurred. It is undisputed that the Advertising Agreement expressly contemplated advance billing, and that Novartis and EPB regularly agreed to advance billing during the course of their relationship prior to the 2002 Advertising Campaign. There is also no

11

dispute that Novartis expressly agreed to an advance billing schedule for the 2002 Advertising Campaign under which it paid EPB $9.4 million for placement of planned television advertisements before many of the advertisements actually aired. Thus, Novartis's obligation to pay the $9.4 million was due by virtue of its own agreement, even though EPB's performance had not yet occurred.

Under these circumstances, at the time Novartis paid the Media Placement Invoices, "there was a valid, subsisting, matured obligation for payment," which could properly be assigned to UPSC. Irrigation Ass'n v. First Nat'l Bank of Frisco, 773 S.W.2d 346, 351 (Tex. Ct. App. 1989). Because Novartis had agreed to the advance payments, the assignment gave rise to no right of action by Novartis against UPSC. See id. ("The fact that Payor elected to enter into a contract which called for payment in advance of performance was a choice made by Payor, not by Assignee Bank"). Indeed, to permit such an action "would amount to the grant of a windfall recovery to [Novartis]," because Novartis "did not bargain for the financial strength and reputation of [UPSC]; it bargained only for the financial strength and reputation of [EPB]." Id.

12

Third, the evidence does not support Novartis's contention that it was entitled to notice of the assignment of the Media Placement Invoices but did not receive such notice. Nothing in the UCC requires that an account debtor receive notice of the assignment of its account. The failure to give notice of an assignment simply allows the account debtor to pay the assignor directly, whereas providing notice requires the account debtor to pay the assignee in order to discharge its obligation. UCC § 9-406(a), O.C.G.A. § 11-9-406(a). Notification is for the benefit of the assignee, who would otherwise have no recourse against the account debtor if the assignor failed to forward payment that the account debtor made directly to the assignor. Thus, lack of notice has no effect on the validity of the assignment or the legality of the factoring arrangement.

Even if Novartis had been entitled to notice, the evidence shows that it received sufficient notice of the assignment. After entering into the Factoring Agreement, EPB notified Novartis by telephone that it had changed its "banking relationship," and that all future payments would "be going to UPS Capital." (Frattaroli Dep. at 184.) The Factoring Agreement required Panoramic to include an assignment stamp on each invoice notifying

13

account debtors that the account had been assigned to UPSC and that payment should be made to UPSC. Although Panoramic failed to include the stamp on many invoices, including the Media Placement Invoices, Novartis received over 40 invoices from EPB that included the assignment notice. The Media Placement Invoices themselves, although they did not contain the assignment stamp, did indicate that payment was to be remitted to:

> Earle Palmer Brown
> UPS Capital Corporation
> P.O. Box 402480
> Atlanta, GA 30384-2480

Novartis's Chief Financial Officer, who approved payment of the Media Placement Invoices, noticed the change in payee but didn't pay any attention to it. (Broadstreet Dep. at 185.) Regardless, Novartis made out the checks to both EPB and UPSC as directed on the invoice. Having acted on the notice by paying UPSC as directed on the invoice, Novartis must be deemed to have received sufficient notice of the assignment. See Florida First Nat'l Bank v. Fryd Constr. Corp., 245 So.2d 883, 886 (Fla. Dist. Ct. App. 1971)(contractor that paid assignee in accordance with notice of assignment could not subsequently dispute sufficiency of notice).

14

Finally, the evidence does not support Novartis's contention that UPSC acted in bad faith by participating in EPB's fiduciary fraud. First of all, as discussed above, it was not improper for EPB to assign the Media Placement Invoices. Therefore, the assignment did not constitute fiduciary fraud. Furthermore, the evidence cited by Novartis does not support its claim that UPSC conspired with EPB and Panoramic to prevent Novartis from learning of the factoring arrangement so that they could misappropriate the Media Placement Money. In support of this contention, Novartis cites evidence purportedly showing that UPSC (1) fraudulently instructed EPB to obtain verification of the payment schedule without ever mentioning UPSC or the assignment, (2) agreed to leave assignment stickers off the Media Placement Invoices in order to hide the fact that they were being factored, (3) encouraged EPB to send out the Media Placement Invoices as early as possible so UPSC could obtain the Media Placement Money before media vendors began to demand payment, (4) agreed to help EPB hide its imminent demise, and (5) was aware of the pass through nature of the Media Placement Money. In fact, the evidence does not support any of these claims.

AO 72A
(Rev.8/82)

First, the allegedly fraudulent verification of the Media Placement Invoices is based on an email from EPB to Novartis stating that EPB's "accounting folks" wanted confirmation of the billing schedule "for their files," when the request actually originated with UPSC. There is no evidence, however, that this was part of a deliberate scheme to prevent Novartis from learning of the factoring arrangement. In testimony that is unrebutted, the author of the email said that EPB's Chief Financial Officer–not UPSC–made the request of him, so it was completely accurate for him to say that the request came from EPB's accounting folks for their files. (Roxbury Dep. at 107-08.)

Second, Novartis contends that "UPSC agreed to leave the [assignment] stickers off the Novartis media placement invoices so as to hide the fact that they were being factored." (Resp. to Mot. for Summ. J. at 30.) At most, however, the evidence shows only that Panoramic failed to put assignment stickers on some invoices, including the Media Placement Invoices, and that UPSC elected not to treat such invoices as ineligible for factoring. That is unremarkable given that, as discussed above, insisting on notice is a factor's

16

right, not an obligation, and the only party put at risk by that decision was UPSC.

Third, the evidence shows that UPSC had nothing to do with establishing the billing schedule for the Media Placement Invoices. Novartis relies on the affidavit of RJ Palmer's Chief Financial Officer, Peter Stieglitz, who testified that in early 2002 he attended a meeting at UPSC's offices in Atlanta where he "was encouraged by UPSC, EPB and Panoramic to issue invoices for media placement as early as possible." (Stieglitz Aff. ¶ 6.) This meeting, however, took place long after the billing and payment schedule for the Media Placement Invoices had been set. Moreover, as Mr. Stieglitz acknowledged in his deposition, there was "nothing nefarious" about UPSC encouraging him to submit invoices early. (Stieglitz Dep. at 244.) The earlier invoices are issued, the earlier they can be factored. That enhances cash flow, which is the very purpose of a factoring arrangement.

Fourth, Novartis contends that UPSC conspired with EPB and Panoramic to hide their deteriorating financial condition. However, UPSC was under no obligation to provide Novartis information about EPB's and

17

Panoramic's financial status. See B.E.L.T., Inc. v. Wachovia Corp., 403 F.3d 474, 477 (7th Cir. 2005)(lender had no duty to disclose borrower's financial instability and suspected "machinations" to other lenders or regulators). Moreover, regardless of their financial condition, there is no evidence that UPSC was aware of any intent by EPB and Panoramic not to pay the media vendors as promised.

Finally, Novartis's contention that UPSC was aware of the "pass through" nature of the Media Placement Money is simply another way of arguing that the funds were held in trust. As discussed above, however, the evidence does not support such a claim. The mere fact that the funds were ultimately intended for payment of third parties does not transform an otherwise valid factoring arrangement into an illegal transaction. As the factoring cases illustrate, the law does not prohibit factoring accounts even though the funds from the payment of the accounts are intended to be used to pay third-party vendors. See, e.g., Michelin, 666 F.2d at 675 (funds from factored accounts were to be used to pay assignor's subcontractors); Lydig, 697 P.2d at 1020 (funds from factored accounts were intended to pay third-party suppliers).

18

Summary

For the foregoing reasons, the Court GRANTS defendant UPSC's motion for summary judgment [#200-1] and DISMISSES Novartis's complaint against defendant UPSC; DENIES defendant UPSC's request for oral argument [#200-2]; DENIES plaintiff's motion to strike [#271-1]; GRANTS plaintiff's alternative motion for leave to file surreply [#271-2]; and GRANTS defendant UPSC's request to file a response to plaintiff's surreply [#274].

IT IS SO ORDERED, this 28 day of March, 2006.

_____
Marvin H. Shoob, Senior Judge
United States District Court
Northern District of Georgia

AO 72A
(Rev.8/82)